**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**BARBARA JUNE TENNANT,**

        **Plaintiff,**

**v.**                             **Civil Action No.: 5:15cv105**
                                       **(The Honorable Frederick P. Stamp, Jr.)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

        **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Barbara June Tennant ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) for judicial review of the final decision of the defendant, Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner"), denying Plaintiff's claim for supplemental security income ("SSI") under Title XVI of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. §§ 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for SSI on July 19, 2012, alleging disability beginning on July 19, 2012. Plaintiff's applications were denied at the initial and reconsideration levels. Plaintiff thereafter requested a hearing, which Administrative Law Judge Terrence Hugar ("ALJ") held on April 16, 2014, and at which Plaintiff, represented by counsel, and Ms. Linda Dezack, an impartial Vocational Expert ("VE"), testified. On May 30, 2014, the ALJ entered a decision finding Plaintiff was not disabled. Plaintiff appealed this decision to the Appeals

Council and, on July 16, 2015, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.

## II. FACTS

### A. Personal History

Plaintiff was born on February 18, 1975, and was thirty-seven (37) years old on the date the application was filed (R. 26). After having her first son at the age of seventeen, Plaintiff quit high school, and at the time of the administrative hearing, had not earned her GED (R. 39). She currently lives with her son at her cousin's house. Id. She has one other son that lives in Texas. Id. She last worked in 2013 (R. 37).

### B. Medical History Summary

#### 1. Medical History Pre-Dating July 19, 2012

From July 28, 2008, to August 7, 2008, Plaintiff made several trips to the Middle Island Health center. During these visits, Plaintiff had the following complaints: (1) vaginal pain; (2) incontinence; (3) pelvic pain; (4) anxiety; (5) chest pain; and (6) abdominal pain (R. 412–33).

From July 7, 2009, to September 3, 2009, Plaintiff reported to Dr. Barbara J. Theodoro, M.S. After all these visits, Dr. Theodoro summarized the following symptoms about the Plaintiff: (1) feeling of self-neglect and worthlessness; (2) high levels of anxiety and panic, which make social situations difficult; and (3) difficulty in concentrating and organizing her thoughts (R. 318). Dr. Theodoro recommended that Plaintiff undergo therapy to address her anxiety and depression. Id.

On May 4, 2010, Plaintiff met with Ms. Lauren Kaniecki, M.A., at the Wellspring Family Service center with symptoms of anxiety, depression, and hostility (R. 487). Plaintiff stated that she fights with "everyone," and has lost any interest in things she used to enjoy (R. 490–91). Ms.

Kaniecki indicated that Plaintiff's limitations included being quick-tempered, judgmental, and critical (R. 491).

On May 25, 2010, Plaintiff visited Dr. Thomas J. Schmitt, M.D., for an evaluation of her orthopedic status, diabetes, and renal status (R. 321). Plaintiff indicated that she has a history of arthralgia in her spine, elbows, and shoulders. Id. Additionally, she stated that she has had diabetes for over a year and that her incontinence has increased. Id. Following his examination, Dr. Schmitt reported that Plaintiff had no muscle atrophy; normal deep tendon reflexes; full range of motion in joints; Type II diabetes with no evidence of end-organ damage; and no evidence of renal malfunction (R. 323–24).

From March 16, 2011, to June 28, 2011, Plaintiff made frequent trips to the Wetzel County Hospital. During her visits there, she reported the following symptoms: (1) stomach pain [R. 372, 374]; (2) burning sensation during urination [R. 372]; (3) incontinence [R. 382]; (4) genital pain [R. 383]; and (5) toothache [R. 384].

On July 17, 2011, Plaintiff visited the Sistersville General Hospital complaining of a moderate toothache (R. 392). She was prescribed pain relievers afterwards (R. 394).

*2. Medical History Post-Dating July 19, 2012*

On August 28, 2012, Plaintiff reported back to Dr. Schmitt for evaluation of her renal status and diabetes. Following psychical examination, Dr. Schmitt made the following observations: (1) no muscular atrophy; (2) adequate muscle strength; (3) symmetrical deep tendon reflexes; (4) negative straight leg test; (5) normal movements; (6) full range of motion in all joints; (7) urinary incontinence diagnosis with intermittent vaginal pain; and (8) type II diabetes diagnosis with no evidence of end-organ damage (R. 398).

Ms. Holly Coville, M.A., Ed.S., completed a Mental Status Evaluation of Plaintiff on September 15, 2012. Plaintiff indicated to Ms. Coville that she suffers from diabetes, bladder control issues, back pain, and anxiety (R. 405–06). Following the mental evaluation, several diagnostic impressions about Plaintiff were made: (1) generalized anxiety disorder; (2) dysthymic disorder; (3) borderline intellectual functioning; and (4) diabetes, recurrent bladder problems (R. 409). Ms. Coville further noted that Plaintiff has a "poor prognosis," but that it would improve with regular medical treatment (R. 410).

On February 10, 2014, Plaintiff reported to the Wellspring Family Service to meet with Dr. Ida Hatcher, Psy.D., complaining of anxiety and depression. Plaintiff stated that she always feels anxious and has suffered a few panic attacks (R. 479). Following evaluation, Dr. Hatcher noted that Plaintiff has moderate difficulty in social settings and therefore qualifies for generalized anxiety disorder and moderate depressive disorder (R. 484–85).

From February 18, 2013, to January 23, 2014, Plaintiff again made several visits to the Wetzel County Hospital. During her frequent visits, Plaintiff had the following complaints: (1) heel pain; (2) heel spurs; and (3) severe toothaches (R. 434–76).

On March 27, 2014, Plaintiff visited Dr. Keith Poole, D.O., at the Wetzel County Hospital. Review of her bodily systems revealed that Plaintiff had (1) no back pain, joint pain, muscle weakness; (2) anxiety, depression, nervousness; and (3) chest pain, palpitations, and shortness of breath (R. 504). Dr. Poole further noted elevated hypertension (R. 506). He also prescribed Plaintiff more medication to combat her anxiety (R. 505).

### 3. Medical Reports/Opinions

On June 10, 2010, Dr. Uma Reddy, M.D., completed a Physical RFC Assessment of Plaintiff. Dr. Reddy indicated no exertional, postural, manipulative, visual, communicative, and

environmental limitations (R. 329–33). Dr. Reddy further reported that Plaintiff was "not fully credible" and her "ADL limitations are exaggerated" and more related to her depression than anything (R. 334).

On July 30, 2010, Dr. James W. Bartee, Ph.D., completed a Psychiatric Review of Plaintiff. Plaintiff reported to Dr. Bartee that she was suffering from bladder disorder, diabetes, depression, anxiety, and intellectual dysfunction (R. 349). Nonetheless, Dr. Bartee could not complete a full review because there was insufficient medical evidence and Plaintiff "was totally unprepared for her interview." Id.

On November 5, 2010, Dr. Frank Roman, Ed.D., completed a Psychiatric Review of Plaintiff. Dr. Roman indicated there was insufficient evidence for a medical disposition (R. 352). Furthermore, no other sections in the Report were completed because Plaintiff had missed her appointment (R. 364).

On September 19, 2012, Dr. Jim Capage, Ph.D., a state agency disability examiner, completed an RFC assessment of Plaintiff. Dr. Capage indicated that Plaintiff had the following impairments: (1) urinary tract disorder; (2) diabetes; (3) borderline intellectual functioning; (4) anxiety disorder; and (5) affective disorder (R. 60). Although Plaintiff exhibited no postural, manipulative, visual, communicative, or environmental limitations, Dr. Capage noted that the following exertional limitations: (1) can occasionally carry 50 pounds; (2) can frequently carry 25 pounds; (3) can stand and/or walk for 6 hours in a normal workday; (4) can sit for 6 hours in a normal workday; and (5) can have unlimited push/pull usage (R. 62). Dr. Capage further noted that Plaintiff would be moderately limited in the following work activities: (1) ability to understand/remember detailed instructions; (2) ability to carry out detailed instructions; (3) ability to maintain attention/concentration; (4) ability to work in coordination with/in proximity

with others; (5) ability to complete a normal workday without interruptions from psychologically based symptoms; (6) ability to interact appropriately with the general public; (7) ability to accept instructions and respond to criticism; (8) ability to get along with co-workers; (8) ability to respond to changes in the work setting; and (9) ability to travel in unfamiliar places (R. 63–64). Finally, Dr. Capage reported that Plaintiff can

> at least learn and perform repetitive 2-3 step work-related activities in a setting that keeps changes in routine to a minimum and permits solitary work activity that calls for no more than occasional and superficial interaction with persons familiar to her and requires no interaction with the general public. Tasks should be low stress with no fast-paced production requirements, no supervisory responsibilities and no complex decision making

(R. 64).

On November 5, 2012, Dr. Ann Logan, Ph.D., a state agency disability examiner, also completed a RFC assessment of Plainitiff and came to the same conclusions as Dr. Capage's report (R. 74–76).

### C. Testimonial Evidence

At the administrative hearing held on April 16, 2014, Plaintiff testified regarding her personal and work-related facts. At the time of the hearing she was thirty-nine (39) years old. She has two children; one of her sons lives with her currently at her cousin's house (R. 39). Plaintiff testified that she does receive child support and food stamps. Id.

Turning to her work history, Plaintiff stated that she last worked in 2013 for two months as a dishwasher at a restaurant (R. 37). When asked why she quit that job, she stated "because I had a lot of anxiety, and had a hard time dealing with some of the employees and the manager" (R. 38). She further stated that she is not applying for other jobs because of her anxiety, depression, and her "hard time coping with other people." Id. When pressed to elaborate on her problems on holding a job, Plaintiff testified that she cannot cope with other people; has a hard

time dealing with people who tell her what to do; her depression; and her anxiety in social settings (R. 40–42).

Plaintiff's attorney then proceeded to ask Plaintiff a few questions. Plaintiff testified that she cannot "deal with doing a hundred different things at once" and will become agitated when asked to do a lot of things (R. 42). Plaintiff then testified about her recurrent bladder problems; she stated that she suffers from incontinence everyday (R. 43).

Plaintiff's attorney then touched upon Plaintiff's anger issues. Plaintiff indicated that she becomes angry when "people trying to tell me what to do . . . or people, like, watching over me when I'm working and stuff" (R. 44).

When asked to describe her home life, Plaintiff stated that she does not do much and mainly "sit[s] around and stress[es]." Id. Furthermore, she indicated that she does not read, watch TV, mow the lawn, or drive a car" (R. 45).

This concluded Plaintiff's testimony.

### D. Vocational Evidence

Ms. Linda Dezack, an impartial vocational expert, also testified at Plaintiff's administrative hearing. The ALJ posed the following hypothetical to the VE:

> I'd like you to assume a hypothetical individual with no past jobs. Further assume this individual is available for work at all exertional levels, but if jobs are available, I'd like you to give me the jobs at medium, and the individual must be limited to simple, routine, and repetitive tasks, not able to perform at a production rate pace, but can perform goal-orientated work, must entail no more than occasional interaction with supervisors, co-workers, and the public. Can the hypothetical individual perform any work, and if so, please give me a few examples?

(R. 47). The VE testified that the following jobs would be available: (1) commercial cleaner; (2) order picker; and (3) bagger. Id. The VE further testified that at the listed jobs, someone is allowed to be off task 10% of time, or six minutes of 60 (R. 48). The VE additionally stated that

employers will ordinarily tolerate one to two days of unexcused absences and that three break periods are normally provided per day. Id.

Plaintiff's attorney then questioned the VE. When asked about the bagger position, VE stated that it would be a "little bit longer than occasional" interaction with the public (R. 49). Regarding the commercial cleaner, VE stated that it is an after-hours job done in solitude. Id. Finally, when asked if someone with incontinence would be able to maintain a job due to the several break periods he or she would have to take, the VE stated that the answer would be yes as long as the person would be allowed to off task six minutes out every hour (R. 49–50).

The ALJ further inquired about the bagger position and its contact with the public (R. 50). The VE stated that while the position requires close proximity with the public, it does not require interaction. Id. The VE then stated that laundry worker would be an occupation that would fit the hypothetical provided by the ALJ (R. 51).

This concluded the VE's testimony.

## E. Work History Reports & Disability Reports

### 1. Disability Reports

A disability report, undated, listed the conditions that limit Plaintiff's ability to work: (1) depression; (2) bladder disorder; (3) diabetes; and (4) intellectual disability (R. 210). The report indicated that Plaintiff stopped working because of "other reasons" and lack of transportation (R. 211). The occupations listed under the past job history section included (1) babysitting; (2) bus loading aide; (3) cashier; (4) grille cook; and (5) teleservice representative (R. 212).

Another undated disability report filed afterwards indicated no change from before (R. 209–221).

An undated disability report was filed, which stated that Plaintiff cannot work because she does not "like being around a lot of people" and that depression and stress has intensified (R. 237).

Another undated disability report was filed, which indicated no substantial change from before (R. 250–58).

A disability report was completed on October 4, 2012; Plaintiff indicated that she is "aggervated [sic] with life daily" and that her "nerves are shot." (R. 267). No other changes were noted.

A disability report was completed on November 26, 2012. Plaintiff stated that he does not have much of a social life anymore and must take frequent breaks during activities due to dizzy spells (R. 286).

## 2. Work History Reports

Plaintiff completed a work history report on April 11, 2010. During the past fifteen years, she listed the following jobs: (1) daycare provider; (2) "Lock your heart on kids"; (3) McDonalds; (4) Dairy Queen; (5) City pool; and (6) telemarketing (R. 194). For the first two occupations, daycare and "Lock your heart on kids," Plaintiff stated that her main tasks were taking care of children, cooking, and feeding them (R. 195–196). She indicated that she walked for approximately two hours a day and would stand and sit for most of the day as well. Id. At McDonalds, Plaintiff would walk and stand for 8–9 hours a day at the register; she also stated that the heaviest weight she lifted was less than ten pounds (R. 197). At Dairy Queen, she did the same tasks she did at McDonalds except that she would only walk and stand for 5–6 hours a day (R. 198). While working at the City Pool, Plaintiff stated she ran the concession stand and would walk and stand for 6–7 hours a day while lifting objects less than ten pounds (R. 199). Finally, as

a telemarketer, Plaintiff stated she mainly sat at a desk, for 6–7 hours, while making sales calls to people (R. 200).

## F. Lifestyle Evidence

### 1. Adult Function Report

On April 9, 2010, Plaintiff completed an adult function report. She indicated that her anxiety and communication limits her ability to work because she has a difficult time working with other people (R. 183). Regarding her daily activities, Plaintiff stated that her main duties were getting her son off to school and house cleaning[1] (R. 184). Before her injuries, she stated that she had more energy and was able to accomplish more during the day. Id. Plaintiff further reported that she goes outside daily, either by walking or driving in a car (R. 186). She also shops in stores for food and household items. Id. Regarding her hobbies, interests, and social activities, Plaintiff reported that she listens to music a lot, talks with her friends about her problems, but that she can get stressed out easily by the least little things (R. 187–88). About her physical limitations, Plaintiff indicated that she can lift 100 pounds, walk for about ten minutes before taking a break, and rest for ten minutes before continuing (R. 188). Overall, she emphasized that she cannot handle stress well, which led to her not working (R. 189).

Plaintiff completed another function report on September 25, 2010. She stated that her depression and stress with dealing with other people limits her ability to work (R. 226). Her daily activities remained unchanged from last report: get up, help son get ready for school, and cook dinner (R. 227). She indicated that she cares for a pet with her son's help. Id. She further added that she still cleans around the house (R. 228). She reported that she goes out with friends and still continues to grocery shop (R. 229). She further indicated that she likes to still play cards, read, and visit her neighbors on a fairly regular basis (R. 230). However, she stated that standing

[1] She stated that she does laundry, cleaning, taking out trash, and cook meals daily (R. 185).

and walking for about 15–20 minutes causes her pain (R. 231). No ambulatory devices are needed nonetheless (R. 232).

Plaintiff filled out an undated function report where she stated that she cannot work because people get on her nerves a lot and that she has frequent bladder trouble (R. 259). She further stated that personal care has become more difficult and that she needs help cooking and doing yard work (R. 260–61). Furthermore, she rarely ventures outside anymore and has lost all interest in doing any hobbies (R. 262–63). Physical movement has also become difficult too (R. 264).

On October 27, 2012, Plaintiff completed another adult function report. She stated that she does not like to be around other people and that she has to force herself to do things due to her bladder control (R. 276). She indicated that she still has trouble maintaining personal care and hates doing yard work, does not like venturing outdoors and has lost all interest in hobbies (R. 277–80). Last, she stated that she has been suffering memory loss and concentration issues (R. 281).

### 2. Pain Questionnaires

On April 11, 2010, Plaintiff filled out a pain questionnaire. She indicated that she has stomach and vaginal pain, which lasts for 20–30 minutes daily; she stated that pain medication sometimes relieves her cramping symptoms (R. 204–208).

Plaintiff completed another pain questionnaire on August 9, 2012, where she stated that she has pain in her "bladder and [] crotch" area lasting for 30 minutes to an hour (R. 244). She indicated that she is taking pain medication, but that it only works to sometimes relieve the pain (R. 245–49).

# III. THE FIVE STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2004). The Social Security Administration uses the following five-step sequential evaluation process to determine whether a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the [RFC] of the claimant is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2015); 20 C.F.R. § 416.920 (2012). In steps one through four, the burden

is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or

she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once this is proven, the burden of proof shifts to the Government during step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled at any of the five steps, the process will not proceed to the next step. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

## IV. THE ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since July 19, 2012, the application date.

2. The claimant has the following severe impairments: anxiety, Dysthymic Disorder/Major Depressive Disorder and Borderline Intellectual Functioning (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: she is limited to simple, routine and repetitive tasks. She is unable to perform at a production rate pace, but can perform goal-oriented work. The claimant's work must entail no more than occasional interaction with co-workers, supervisors and the public.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on February 8, 1975 and was 37 years old, which is defined as a younger individual age 18–49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since July 19, 2012, the date the application was filed (20 CFR 416.920(g)).

## V. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1. The ALJ failed to provide an adequate explanation for her RFC finding, thereby frustrating meaningful review by this Court.

2. The ALJ failed to comply with 20 CFR 416.927 in evaluating the opinions of two State Agency psychological consultants.

The Commissioner contends:

1. The ALJ's RFC is supported by substantial evidence.

2. The ALJ appropriately assessed all of the opinions of record.

### C. ALJ's RFC Analysis is Supported by Substantial Evidence

Plaintiff first contends that the ALJ's RFC finding "did not consider 'all the relevant evidence' in the administrative record . . . and the ALJ failed to provide a clear explanation for the RFC limitations he found or reject" (Pl.'s Br. at 7). Specifically, Plaintiff argues that the "ALJ did not explain what portions, if any, of the State agency assessments he credited in his RFC and failed to explain the basis for his contrary RFC findings" (Pl.'s Br. at 11). Plaintiff seemingly focuses on the apparent discrepancy between the State agency assessments and the ALJ's RFC conclusion regarding Plaintiff's interaction with the public. Id. Without such explanation, Plaintiff asserts that the Court cannot meaningfully review the ALJ's decision. Id.

On the other hand, Defendant argues that the ALJ's RFC determination complied with all regulations and Social Security agency guidelines and policies (Def.'s Br. at 10). Defendant asserts that the ALJ here "thoroughly discussed all of the relevant evidence, including Plaintiff's allegations regarding her symptoms and limitations, her treatment history, the clinical findings, and the opinion evidence" (Def.'s Br. at 11).

In his decision, the ALJ determined that Plaintiff has the RFC to perform:

a full range of work at all exertional levels but with the following non-exertional limitations: she is limited to simple, routine and repetitive tasks. She is unable to perform at a production rate pace, but can perform goal-oriented work. The claimant's work must entail no more than occasional interaction with co-workers, supervisors and the public.

(R. 16). The ALJ further noted in his opinion, after reiterating the entire medical record of Plaintiff, that he concurs with the opinion of the State Agency medical consultants that Plaintiff "does not have a physical impairment that is 'severe' within the meaning of the Regulations . . . . [and that Plaintiff] ha[s] moderate functional limitations" (R. 26).

Under the Social Security Act, a claimant's RFC represents the most a claimant can do in a work setting despite the claimant's physical and mental limitations. 20 C.F.R. § 416.945(a)(1). Furthermore, a person's "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis;" that is, for "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The Administration is required to assess a claimant's RFC based on "all the relevant evidence" in the case record. 20 C.F.R. § 416.945(a)(3). Even though the Administration is responsible for assessing RFC, the Plaintiff has the burden of proving her RFC. See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993) (per curiam) (citing Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983)) (claimant has the burden of production and proof through the fourth step of the sequential analysis); see also 20 C.F.R. § 416.945(a)(3) (claimant is responsible for providing evidence to be used to develop RFC).

The evaluation of a Plaintiff's mental RFC is an assessment of his ability to perform certain mental activities, such as limitations in understanding, remembering, or carrying out instructions; or responding appropriately to supervision, co-workers, and work pressures in a work setting. 20 C.F.R. § 416.945(c). The claimant's mental RFC is determined by evaluating evidence such as:

- History, findings, and observations from medical sources (including psychological test results), regarding the presence, frequency, and intensity of hallucinations, delusions or paranoid tendencies; depression or elation; confusion or disorientation; conversion

symptoms or phobias; psychophysiological symptoms; withdrawn or bizarre behavior; anxiety or tension.

- Reports of the individual's activities of daily living and work activity, as well as testimony of third parties about the individual's performance and behavior.

- Reports from workshops, group homes, or similar assistive entities.

SSR 85-16, 1985 WL 56855, at *2 (1985). An evaluation of physical limitations involves examining the demands of work activity "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching." 20 C.F.R. § 416.945(b).

Plaintiff's argument rests upon the Fourth Circuit Court of Appeal's holding in Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015), where it decided that "[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Mascio, 780 F.3d at 636 (internal quotations marks and alterations omitted).

Unlike Mascio, however, the ALJ here considered the conflicting evidence and assigned it the appropriate weight he found it deserved. In his opinion, the ALJ found that Plaintiff's hearing testimony and statements concerning her symptoms were not entirely credible (R. 25). The ALJ then discussed the medical record at length to support the limitation of occasional interaction with the public: (1) Plaintiff's normal social function limits according to Ms. Coville (R. 23); (2) Plaintiff's average social skills as noted by Dr. Hatcher (R. 24); (3) Plaintiff's contradiction between her hearing testimony and her statements to Dr. Hatcher regarding her friends (R. 25); (4) Plaintiff's statements that she talks to friends/family and visits her neighbors house (R. 230); and (5) Plaintiff's statements that she had never "gone off" on co-workers before (R. 17). Here, the ALJ seemingly went step-by-step dissecting the entire medical record in his

opinion (R. 16–26). Using all this medical evidence as support, the undersigned does not agree with Plaintiff's position that "meaningful review" has been frustrated.

As outlined in the C.F.R., the RFC is assessed by the ALJ only after he reviews all relevant evidence of a claimant's impairments and related symptoms. <u>See</u> 20 C.F.R. § 416.945(a)(3). In his assessment of Plaintiff's RFC, the ALJ reviewed all of Plaintiff's evidence, including the impairments, pain symptoms, physical and mental limitations, and pertinent medical evidence in the record (R. 16–26). In <u>Mascio</u>, it was the "lack of explanation" that mandated remand of the case. <u>Mascio</u>, 780 F.3d at 640. This is not the case here. Accordingly, the undersigned finds that the ALJ's RFC determination is supported by substantial evidence.

### D. All Medical Opinions Were Properly Evaluated

Plaintiff next contends that the ALJ failed to comply with 20 C.F.R. § 416.927(b) by not evaluating the medical opinions of Dr. Capage and Dr. Logan (Pl.'s Br. at 12–13). Plaintiff specifically states that the ALJ never explicitly assigned weight to the two RFC assessments; never acknowledged the opinions; and did not explain what he accepted and rejected in his RFC conclusion (Pl.'s Br. at 13),

Defendant counters with the fact that Plaintiff is "[a]ttempting to take another chance at the same argument" (Def.'s Br. at 13). Defendant asserts that case law and Social Security rulings do not require the ALJ to list out every single factor found in Section 416.927(b) when evaluating medical opinions. <u>Id.</u>

In the opinion, the ALJ stated that he "considered the opinions of the State Agency medical and psychological consultants . . . . [and] concurs . . . that the [Plaintiff] does not have a physical impairment . . . [and that Plaintiff] ha[s] mild to moderate functional limitations" (R. 26).

Under 20 C.F.R. § 416.927, the ALJ uses the following factors when evaluating opinion evidence: (1) examining relationship; (2) treatment relationship; (3) length of treatment relationship; (4) nature and extent of treatment relationship; (5) supportability; (6) consistency; and (7) specialization. 20 C.F.R. § 416.927(c)(1–6). ALJs, however, are "not bound by any findings made by State agency medical or psychological consultants." Id. at 416.927(e)(2). In addition, ALJs must "explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us." Id. at 416.927(e)(2)(ii). Finally, this Court has held that the ALJ is not required to list out every single factor in his analysis when evaluating medical opinions. See e.g., McKenzie v. Colvin, No. 2:14cv52, 2015 WL 3442084, at *24 (N.D. W. Va. May 28, 2015).

Here, the undersigned agrees with Plaintiff that the ALJ did not *explicitly* assign weight to the two State agency physician reports (R. 26). The ALJ did, however, state that he concurred with the State agency reports and found that they were supported by the objective medical evidence. Id. Taking the ALJ's concurrence with the State agency reports into account, the undersigned finds the failure to assign an explicit weight constitutes harmless error as the record is supported by substantial evidence to support the ALJ's opinion. See Emigh v. Comm'r of Soc. Sec., No. 3:14cv36, 2015 WL 545833, at *21 (N.D. W. Va. Feb. 10, 2015) ("The court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination"). Lastly, as reiterated above, contrary to Plaintiff's argument, the ALJ is not required to list out every single

factor in his analysis when evaluating medical opinions. See e.g., McKenzie v. Colvin, No. 2:14cv52, 2015 WL 3442084, at *24 (N.D. W. Va. May 28, 2015).

The ALJ here, as discussed in the previous section, conducted a thorough review of the Plaintiff's entire medical record throughout the opinion and found that it supported his RFC determination (R. 16–26). Accordingly, the undersigned finds that substantial evidence supports the ALJ's evaluation of the medical opinions.

## VI. RECOMMENDED DECISION

For the reasons herein stated, I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DISMISSED** and this matter be stricken from the Court's docket for the reasons stated forth within.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 17th day of June, 2016.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE